**FILED**

SEP 2 5 2013

Clerk, U.S. District and
Bankruptcy Courts

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| "SIKHS FOR JUSTICE" (SFJ) on behalf of deceased and tortured members of Sikhs community; | ) ) ) ) | Civ. No._____ |
| INDERJIT SINGH an individual, national and citizen of India on his own behalf and on behalf of members of his family | ) ) ) ) ) | |
| John Doe, Un-named victims of torture | ) ) ) ) ) | Case: 1:13-cv-01460 Assigned To : Boasberg, James E. Assign. Date : 9/25/2013 Description: Pro Se Gen. Civil |
| **Plaintiffs,** | ) ) | **JURY ACTION** |
| v. | ) ) ) ) | JURY TRIAL DEMANDED |
| Manmohan SINGH, a national and citizen of India, | ) ) ) ) | |
| **Defendant.** | ) ) | |

Plaintiffs, individually and collectively, allege the following:

## I. PRELIMINARY STATEMENT

1) The above named plaintiffs themselves or their legal heirs, relatives, next of kin, have

suffered torture, cruel and inhuman treatment while residing in India in the hands of Police

and other law enforcement agencies which are headed by the Defendant Manmohan Singh as

Prime Minister of India.

2) The defendant is a national and citizen of India, a politician and leader of the ruling party of

the country. The defendant and his party have been ruling India since 2004.

3) The defendant Manmohan Singh's culpability in the crimes of torture and extra judicial killings of Sikhs started in 1991 when he took the office of Finance Minister of India. While heading the Finance Ministry, the defendant approved, and financed several so called "counter insurgency" operations mounted in the state of Punjab resulting in more than hundred thousand Sikhs being killed extra judicially and several hundred thousand being tortured. According to Human Rights Watch, "Police counter-insurgency efforts included torture, forced disappearances, and a bounty system of cash rewards for the summary execution of suspected Sikh militants. (*HRW* 10 Jun 2003). Thousands of people were killed in Punjab during 1980s and 1990s as a result of the Sikh separatist insurgency in the Indian state of Punjab. "The decade-long police crackdown of [sic] the insurgency led to the deaths of at least 40,000 people in Punjab" (*Committee for Coordination on Disappearances in Punjab* (CCDP) Jun 2003), "including 10,000 civilians (*Amnesty International* Report, 20 Jan 2003).

4) During his tenure as Finance Minister (1991-96), defendant Manmohan Singh approved and funded the infamous practice of "cash rewards" to members of security forces for killing Sikhs through extra judicial means often in "staged and fake encounters" to curb the Sikh rights movement in Punjab. *See* The Tribune news report "DGP fears threat to Sukhi's life" published on February 20, 2006. http://www.tribuneindia.com/2006/20060220/main4.htm

5) Upon information and belief, during defendant's tenure as Finance Minister, more than two hundred million dollars were approved and disbursed in "cash rewards" to members of security forces for extra judicial killing of Sikhs.

6) Defendant's policy of "cash rewards" for extra judicial killing of Sikhs was implemented through notorious police officers including K.P.S Gill, the then Director General of Police

2

Punjab; Sumedh Saini current Director General of Police; Muhammad Mustafa, Izhar Alam, Ananya Gautam, H.S.Dhillon, S. Chattopadhyay and many others. *See* "Encounters - Facts and Fictions" Report by Prabhjot Singh published in The Tribune dated March 12, 2006. Available online at http://www.tribuneindia.com/2006/20060312/spectrum/main1.htm . In "Endgame in Punjab: 1988-1993," KPS Gill describes how he developed "a radical policy of postings and promotions." KPS Gill, "Endgame in Punjab: 1988-1993," 2001, South Asia Terrorism Portal, http://www.satp.org/satporgtp/publication/faultlines/volume1/Fault1-kpstext.htm (accessed May 4, 2007). See also, Shekhar Gupta and Kanwar Sandhu, "KPS Gill: True Grit," *India Today* (April 15, 1993), p.64 (DGP Gill promoted the best officers)

7) During his tenure as Prime Minister (2004-present) defendant has been and continues to be in command and control of the police and all other security forces in the country. The forces under his control have perpetrated acts of extra judicial killings and torture upon the individual defendants, their heirs, representatives, next of kin, and/or upon other members of the class of individuals similarly situated.

8) During his tenure as Prime Minister (2004-present), defendant has actively shielded and protected members of his political party who were involved in organizing and carrying out genocidal attacks on Sikh population of India during November 1984 resulting in death of more than 30,000 Sikhs. One of defendant's cabinet member, Kamal Nath, led the attack on Gurudwara Rakab Ganj in Delhi during November 1984 in which many Sikhs were burnt alive. *See* Justice Nanavati Commission Inquiry Report of 2005.

9) During his tenure as Prime Minister (2004-present), defendant has protected and promoted the members of security forces who were involved in extra judicial killings and torture of Sikhs.

10) As per the reports of international human rights organizations, Indian security forces have extra judicially killed over hundred thousand Sikhs in the state of Punjab during the so called "counter insurgency" operations.

11) The plaintiffs are those and represent those who were either personally tortured or represent those who were tortured or killed by the forces operating the command and control of the defendant during the relevant time period or were killed or tortured during the so called "counter insurgency" operations that were financed and funded by the defendant.

12) According ENSAAF, a US based nonprofit organization working to end impunity and achieve justice for mass state crimes in India, with a focus on Punjab, by documenting abuses, bringing perpetrators to justice, and organizing survivors,

13) According to renowned journalist and human rights activist, Ram Narayan Kumar, "Indian security forces arbitrarily detained, tortured, executed, and "disappeared" tens of thousands of Sikhs in counterinsurgency operations" *See* Ram Narayan Kumar, et al., *Reduced to Ashes*, pp. 56, 58. For other reports on abuses by Indian security forces, see Human Rights Watch/Asia and Physicians for Human Rights, *Dead Silence; Human Rights Watch, India— Punjab in Crisis: Human Rights in India* (New York: Human Rights Watch, 1991); Amnesty International, "Human Rights Violations in Punjab; Use and Abuse of the Law," May 1991, http://www.amnestyusa.org/document.php?id=8D63FE02A44B98C8802569A600600B91 ; Amnesty International, "Punjab Police: Beyond the Bounds of Law," April 1995, http://www.amnestyusa.org/document.php?id=3D24566B3D60358B802569A500715046 ; Amnesty International, "Break the Cycle of Impunity and Torture in Punjab," AI Index: ASA 20/002/2003, January 2003, http://web.amnesty.org/library/Index/ENGASA200022003?open&of=ENG-IND

14) The United States government described the Punjab police practice of faked encounter

killings in 1993:

> "In the typical scenario, police take into custody a suspected
> militant or militant supporter without filing an arrest report. If the detainee
> dies during interrogation or is executed, officials deny he was ever in
> custody and claim he died during an armed encounter with police or
> security forces. Alternatively, police may claim to have been ambushed by
> militants while escorting a suspect. Although the detainee invariably dies
> in "crossfire," police casualties in these "incidents" are rare".
> (*See* US State Department, Bureau of Democracy, Human Rights, and
> Labor, "Country Reports on Human Rights Practices—1993: India,"
> January 31, 1994,
> http://dosfan.lib.uic.edu/ERC/democracy/1993_hrp_report/93hrp_report_s
> asia/India.html )

15) In early 1995, human rights activists Jaswant Singh Khalra and Jaspal Singh Dhillon, of the

Akali Dal political party, used government crematoria records to expose over 6,000 secret

cremations by the police in just one of then 13 districts in Punjab. They focused their

investigations on illegal cremations, putting aside other possible ends of the victims' bodies,

such as dismemberment or dumping in canals. Jaswant Singh Khalra described how the

hesitation of family members to report "disappearances" led him and Dhillon to the

cremation grounds: "[C]ountless mothers, countless sisters weren't ready to say that [their

loved one was "disappeared"]. They said, "[I]f you take this issue further, and our son is still

alive, they [the police] will kill him." *See* Ensaaf, "Sardar Jaswant Singh Khalra," video

report, 2006, http://www.ensaaf.org/docs/khalravideo.php

16) This is a civil action for compensatory and punitive damages against defendant Manmohan

Singh for violations of state, federal and international law committed against the Plaintiffs.

## II. PARTIES

### A. Named Plaintiffs

17) Plaintiff "Sikhs for Justice" is a legal entity registered and incorporated in the State of New
York with a 501(c)(3) (not for profit) status, working to seek justice Sikhs killed or tortured
in India from 1984 onwards.

18) The plaintiff Inderjit Singh, is a male, Sikh, resident of state of Punjab, native and citizen of
India. The plaintiffs was illegally detained and tortured by the police in India on the false
allegations of of helping Sikh militants. The plaintiff's father, Mr. Tehal Singh is an active
member of Shiromani Akali Dal Amritsar (SAD Amritsar), a political party peacefully
struggling for the Sikhs' right to self determination. During the so called "counter
insurgency" operations and campaigns in Punjab which were approved, financed and funded
by the explicit authority of the defendant, the plaintiff and his father, were illegally detained
and tortured by the security forces during 1996 on the false allegation of helping Sikh
militants. In fact the plaintiff and his father were only involved in supporting the lawful,
political, peaceful and democratic demand of SAD (Amritsar). During this detention, the
security forces officials tortured the plaintiff and demanded that he work as an informant and
report his fellow community members to the police. The security forces officials offered the
money and release from custody if the plaintiff agreed to work as "under cover" informant.
The plaintiff was told by the security forces officials that Ministry of Finance of India has
allocated and approved funds amounting to hundreds of millions of rupees and made these
funds available to security forces to hire people like plaintiff as informants on the Sikh
political activists and to hire "private killers" infamously known as "Black Cats" to extra
judicially kill the Sikh youths for "cash rewards" and to curb the Sikh rights movement.

6

Upon his release from custody, the plaintiff fled India fearing his life, however upon his

return in 2005, the plaintiff was again detained by the security forces and was again tortured.

This time, the defendant, as the Prime Minister of the country, was head and in charge of all

the security forces. The plaintiff upon his release, again left the country. During 2010, 2011,

2012 and 2013, the plaintiff's family which is still residing in India has been raided, illegally

detained and tortured by security forces on several occasions, as part of on going so called

"country insurgency" operation approved, funded and financed by the defendant.


**B.  Named Defendant**

19) Defendant is an individual citizen and national of India.  Defendant is leader and Indian

National Congress aka Congress-I, a political party ruling India since 2004. The defendant is

currently Prime Minister (PM) of India. The defendant has been PM since 2004 and as PM,

defendant is head of executive of India and heads all the security forces and police of the

country.

20) The defendant Manmohan Singh's  culpability in the crimes of torture and extra judicial

killings of Sikhs started in 1991 when he took the office of Finance Minister of India. While

heading the Finance Ministry, the defendant approved, and financed several so called

"counter insurgency" operations mounted in the state of Punjab resulting in more than

hundred thousand Sikhs being killed extra judicially and several hundred thousand being

tortured.

21) During his tenure as Finance Minister (1991-96), defendant Manmohan Singh approved and

funded the infamous practice of "cash rewards" to members of security forces for killing

7

Sikhs through extra judicial means often in "staged and fake encounters" to curb the Sikh rights movement in Punjab.

22) Upon information and belief, during defendant's tenure as Finance Minister, more than two hundred million dollars were approved and disbursed in "cash rewards" to members of security forces for extra judicial killing of Sikhsduring

23) Defendant's policy of "cash rewards" for extra judicial killing of Sikhs was implemented through notorious police officers including K.P.S Gill, the then Director General of Police Punjab; Sumedh Saini current Director General of Police; Muhammad Mustafa, Izhar Alam, Ananya Gautam, H.S.Dhillon, S. Chattopadhyay and many others.

24) During his tenure as Prime Minister (2004-present) defendant has been and continues to be in command and control of the police and all other security forces in the country. The forces under his control have perpetrated acts of extra judicial killings and torture upon the individual defendants, their heirs, representatives, next of kin, and/or upon other members of the class of individuals similarly situated.

25) During his tenure as Prime Minister (2004-present), defendant has actively shielded and protected members of his political party who were involved in organizing and carrying out genocidal attacks on Sikh population of India during November 1984 resulting in death of more than 30,000 Sikhs. One of defendant's cabinet member, Kamal Nath, led the attack on Gurudwara Rakab Ganj in Delhi during November 1984 in which many Sikhs were burnt alive.

26) During his tenure as Prime Minister (2004-present), defendant has protected and promoted the members of security forces who were involved in extra judicial killings and torture of Sikhs.

8

27) As per the reports of international human rights organizations, Indian security forces have extra judicially killed over hundred thousand Sikhs in the state of Punjab during the so called "counter insurgency" operations.

28) As PM, defendant Manmohan Singh is directly and ultimately responsible for the actions of all the government machinery and particularly the security forces and the Police the operating under his command and control.

29) As PM the defendant exercises and during relevant times exercised full control over the security forces in India, particularly, appointment, transfer, promotion, demotion, suspension and relegation of officers and members of the security forces.

30) The defendant, throughout his tenure has also actively shielded, protected and promoted the police officers who were or have been involved in gross human rights violations, extra judicial killings and torture.

**C. Class Allegations**

31) The class consists of all men, women and children who survived illegal detentions, torture (mental and physical) and degrading and inhuman treatment in the hands of Indian police and other security forces in Punjab during the period of counter insurgency in Punjab, specifically between 1991-96 and from 2004 to present.

32) The class also consists of next of kin of the legal/personal representatives of the next of kin of those who were killed during the relevant time period in extra judicial killing in the hands of Indian Police or other security forces in Punjab.

33) The exact number of class members is not known, however, it is commonly believed and estimated that from June 1984 till today, well over 100,000 (one hundred thousand) have

been extra judicially killed and several hundred thousand tortured by the Indian Police and

other security forces in the state of Punjab,.

34) The claims of the named Plaintiff, the class representative, are typical of the claims of the

class. The named plaintiffs are able to and will fairly and adequately protect the interests of

the class.

35) There are common questions of law and fact in this action that affect and relate to each

member of the class including:

  a. Whether the defendant directly or indirectly, aided and abetted by financing
    and funding the unlawful acts of Indian police and other security forces, to wit
    torture and extra judicial killings, committed in the State of Punjab during his
    tenure as Finance Minister (1991-96)?

  b. Whether the defendant authorized, commanded, or directed the unlawful acts
    to, wit torture and extra judicial killings, of the Indian police and security
    forces operating under his command and authority as Prime Minister during
    2004-Present.

  c. Whether the Defendant, Finance Minister (1991-96) earmarked, approved and
    disbursed funds to the Indian police and security forces under the head of
    "cash rewards" for killing Sikh nationalists from Punjab.

  d. Whether the Defendant, Finance Minister (1991-96) earmarked, approved and
    disbursed funds to the Indian police and security forces for counter insurgency
    operations carried out in Punjab.

  e. Whether the defendant knew or should have known that Indian police and
    security forces committed and continue to commit acts of torture, abuse and
    inhuman and cruel treatment against the named and unnamed individual
    Defendants.

  f. Whether defendant failed to punish or ratified such unlawful acts committed
    by the Indian police and security forces?

  g. Whether defendant failed to take adequate and appropriate measures to
    prevent police officers and members of security forces from committing acts
    of torture and violations of human rights?

  h. Whether the defendant acted upon, promoted and continues to promote and
    practice "impunity" towards the members of security forces and police
    officers who have been involved in torture and human rights abuses?

  i. Whether the defendant's regime is guilty of impunity by defending the
    notorious Police Officers K.P.S Gill, the then Director General of Police
    Punjab; Sumedh Saini current Director General of Police; Muhammad
    Mustafa, Izhar Alam, Ananya Gautam, H.S.Dhillon, S. Chattopadhyay and
    many others?

     j.   Whether the defendants actions relating to police officers and security forces during 1991-96 and 2004-present give rise to liability under applicable international and domestic laws.

36)    This action is properly maintained as a class action because: a) Defendant acted and failed to act in a way generally application to the class, making any declaratory relief awarded appropriate to the class as a whole; and b) questions of law and fact common to the class predominate over questions affecting individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## III. JURISDICTION AND VENUE

37) Plaintiffs allege that Defendant is liable for Torture, Cruel and inhuman treatment as defined by customary international law and the Torture Victim Protection Act (TVPA), Pub. L. No. 102-256, 105 Stat. 73 (1992) (codified at 28 USC § 1350, note). Plaintiffs further allege that Defendant is liable for violations of customary international law and treaty law prohibiting the commission of human rights violations and acts of torture. Accordingly, this Court has jurisdiction over this action based on 27 USC § 1350 (Alien Tort Statue) and 28 USC § 1331. The Court has jurisdiction over the state law claims pursuant to 28 USC § 1367.

38) Venue is proper in the District of Columbia pursuant of 28 USC §§ 1391(b)(3) and (d). This Court has personal jurisdiction over Defendant as the Defendant will be present in Washington D.C., within the territorial boundaries of this District, on September 27, 2013

## IV. STATEMENT OF FACTS

39) Sikh are a people with a common religious tradition, a scripture, a linguistic script and several social, political and economic institutions. More than twenty-five million people worldwide identify themselves as adherents of the Sikh faith, making it the fifth-largest world-religion. Sikh doctrine, teaches that all human beings—regardless of their religion or beliefs—have the potential to realize God through devotion, truthful living, pursuit of justice and service of creation. The Sikh religion was founded by Guru Nanak (1469-1539) and shaped by his nine successors in the sixteenth and seventeenth centuries in Punjab.

40) Sikhs of today's Indian Punjab, the state popularly known as "bread basket of India" were brought into fold of the Indian Union by treacherous and never to be fulfilled promises of autonomy, independence, separate identity and protection of rights, by the leadership of Indian National Congress during 1947 partition of India. However, soon after 1947 Indian government and Congress leadership went back on the promises made to Sikhs. The first blow to Sikh identity came in 1952 when despite of unanimous opposition and strong objection of the Sikh community, Article 25 of the Constitution of India was promulgated which amalgamated Sikhism into Hinduism thus dealing a fatal and irreversible blow to the separate identity of Sikhs as a religious community and Sikhism as a religion.

41) Obliteration of separate Sikh identity through Article 25 of the Constitution coupled with the economic exploitation of the Sikhs in Punjab in the form of curtailing land, power, irrigation water, gradually spawned into a powerful movement in the early 1980s, calling for the creation of an independent Sikh state of Khalistan. According to an editorial in The New York Times: "There was a nonviolent Sikh protest movement, but it was eclipsed when the

Prime Minister rebuffed its demands…Since Indian independence in 1947, Sikhs have pleaded for greater autonomy and for specific recognition of their religion in the Constitution. (*See The New York Times,* Editorial, June 8, 1984).

42) Leading researcher and expert on Sikh issues, Cynthia K. Mahmood, sums up what Sikhs have been subjected to in India as "India's crimes of 1984 began with its assault on, and the massacres at, the Golden Temple and dozens of other gurudwaras across India in the first week of June 1984, and continued with the nationwide government-sponsored pogroms of November 1984. In many ways, the crimes still continue, not just in the cover-up and the sheltering of the criminals, but in actual outrages by the government and its minions to date." *See* Cynthia K. Mahmood in "*1984 & I*" "*on the 25th Anniversary of the year a nation sank to a new low in dealing with a religious minority*".

43) Repercussions from two pivotal events in 1984 still resonate through the Indian Punjab: the storming of the Golden Temple at Amritsar by Indian troops, and the assassination of Indira Gandhi by her Sikh bodyguards a few months later, which led to days of anti-Sikh rioting, especially in New Delhi. After 1984 the militant struggle for an independent Sikh state of Khalistan gained considerable momentum, and in the ensuing years thousands were killed in Punjab by both militants and security forces (*Journal of Democracy* Oct. 1993, 60-61).

44) Continuous denial of rights to the Sikh community of Punjab eventually lead to the demand for creation of separate and independent state of Khalistan during the decade of 80s and 90s. In June 1984 Golden Temple, the Vatican of Sikh religion in the city of Amritsar, Punjab was attacked by the Government with 30,000 armed troupes resulting in the death of more than 10,000 pilgrims. The operation is infamously known as "Operation Blue Star".

45) In the aftermath of Operation Blue Star, the Punjab Government through Punjab police and other security forces at its disposal launched a massive counter insurgency initiative under which illegal detention of Sikhs, torture of Sikh detainees and even extra judicial killing of Sikh detainees were used as tools to suppress the movement in support of Khalistan.

46) The defendant during his tenure as Finance Minister of India from 1991-1996 not only funded the unlawful acts of the police and security forces but also allowed and acquiescenced commission of acts of torture by the police and other security forces during his premiership (2004-present).

47) It is believed and estimated that from June 1984 till today, well over 100,000 (one hundred thousand) have been extra judicially killed and several hundred thousand tortured by the Punjab Police and other security forces in the state of Punjab.

## FACTS RELATED TO INJURIES TO INDIVIDUAL PLAINTIFF

48) The plaintiff Inderjit Singh, is male, baptized Sikh, resident of state of Punjab, native and citizen of India. The plaintiffs was illegally detained and tortured by the police in India on the false allegations of of helping Sikh militants. The plaintiff's father, Mr. Tehal Singh is an active member of Shiromani Akali Dal Amritsar (SAD Amritsar), a political party peacefully struggling for the Sikhs' right to self determination. During the so called "counter insurgency" operations and campaigns in Punjab which were approved, financed and funded by the explicit authority of the defendant, the plaintiff and his father, were illegally detained and tortured by the security forces during 1996 on the false allegation of helping Sikh militants. In fact the plaintiff and his father were only involved in supporting the lawful, political, peaceful and democratic demand of SAD (Amritsar). During this detention, the

security forces officials tortured the plaintiff and demanded that he work as an informant and report his fellow community members to the police. The security forces officials offered the money and release from custody if the plaintiff agreed to work as "under cover" informant. The plaintiff was told by the security forces officials that Ministry of Finance of India has allocated and approved funds amounting to hundreds of millions of rupees and made these funds available to security forces to hire people like plaintiff as informants on the Sikh political activists and to hire "private killers" infamously known as "Black Cats" to extra judicially kill the Sikh youths for "cash rewards" and to curb the Sikh rights movement. Upon his release from custody, the plaintiff fled India fearing his life, however upon his return in 2005, the plaintiff was again detained by the security forces and was again tortured. This time, the defendant, as the Prime Minister of the country, was head and in charge of all the security forces. The plaintiff upon his release, again left the country. During 2010, 2011, 2012 and 2013, the plaintiff's family which is still residing in India has been raided, illegally detained and tortured by security forces on several occasions, as part of on going so called "country insurgency" operation approved, funded and financed by the defendant.

    i.      **SPECIFIC ACTS OF TORTURE**:

During the above listed illegal detentions, the petitioner was subjected by the Police and security forces, to following acts which amount to torture:

      I.     Beaten with sticks and leather belts.
     II.     Wooden rollers on legs and thighs.
   III.     Water Boarding
   IV.     Legs pulled and stretched apart
     V.     Hung upside down
   VI.     Given electric shocks
  VII.     Laid on ice slabs

### A. Inadequacy of Local Remedies

49)    Upon information and belief, as practical matter and proven fact, no adequate remedies

are available to Plaintiff under the systems in India. In fact, Indian governments, both State

and Federal, unabashedly practice "impunity" towards the human rights violators. All efforts

by or on behalf of the plaintiffs, or others similarly situated, to seek adequate remedy against

the police officers and/or defendant have been countered by the defendant through his

influence and position, and in fact the defendant has openly shields, protects and promotes

the police officers involved in human rights violations. The impunity enjoyed by notorious

police officers like K.P.S Gill, ex Director General of Police Punjab; Sumedh Saini current

Director General of Police; Muhammad Mustafa, Izhar Alam, Ananya Gautam, H.S.Dhillon,

S. Chattopadhyay and many others who have been responsible for numerous cases of tortures

and extra judicial killings, is telling and establishes the inadequacy of local remedies

available to the petitioners.


### General Allegations

50) The acts described in this Complaint committed by the police and security forces, were

financed and funded or aided and abetted and were or should have been in the knowledge of

the defendant during his tenure as Finance Minister of India (1991-96).

51) The defendant directly or indirectly, ordered, participated, acquiescence, connived, was

aware of, the unlawful act of security forces and Punjab Police committed in the State of

Punjab during his tenure as Prime Minister (2004-present).

16

52) The defendant funded, approved, authorized, commanded, or directed the unlawful acts of the security forces and Punjab Police operating under his command and authority.

53) The Defendant knew or should have known that the security forces and particularly Police committed acts of torture, abuse and inhuman and cruel treatment against the named and unnamed individual Defendants.

54) The defendant failed to punish or ratified such unlawful acts committed by the security forces and Police.

55) The defendant acted upon, promoted and continues to promote and practice "impunity" towards the members of security forces and police officers who have been involved in torture and human rights abuses.

56) The defendant's regime is guilty of impunity by defending the notorious Police Officers including K.P.S Gill, the then Director General of Police Punjab; Sumedh Saini current Director General of Police; Muhammad Mustafa, Izhar Alam, Ananya Gautam, H.S.Dhillon, S. Chattopadhyay and many others.

57) The defendant's actions relating to police and security forces in Punjab, during 1991-96 and 2004-present give rise to liability under applicable international and domestic laws.

## FIRST CLAIM FOR RELIEF
*(Crimes Against Humanity)*

58)     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 53 of this Complaint as if fully set forth herein.

59) The abuses committed against Plaintiffs and decedents constitute crimes against humanity. Defendant knew or should have known that police and security forces under his command and control commit torture and extra judicially kill Sikh individuals in Punjab.

60) Defendant, by virtue of this inhuman act, also caused great suffering and /or serious injury to body or to mental or physical health.

61) Defendant's acts and omissions constitute "tort[s]…committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C  § 1350 and also violate 28 § 1331 in that the acts and omissions against Plaintiff's violated customary international law as reflected , expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

62) The acts and omissions constituting crimes against humanity caused Plaintiff's to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

63) Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.


## SECOND CLAIM FOR RELIEF

*(Cruel, Inhuman, or degrading Treatment or Punishment)*

64) Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 59 of this Complaint as if fully set forth herein.

65) The abuses committed against Plaintiff's and Decedents described herein each separately constitute cruel, inhuman or degrading treatment or punishment. These acts include, but are

not limited to: severe beating; giving electric shocks; laying on the ice slabs; pouring cold

water; beating with leather belts and wooden sticks; rolling wooden rollers on legs and

thighs; pulling and stretching of legs apart; tying down in wooden trap for extended period to

time and slapping,   resulting in severe physical and psychological abuse and agony,

humiliation, fear and debasement; the injury and in some cases death.

66) Defendant's acts also constitute torts committed in violation of the law of nations, and thus of

the United States, as reflected in federal common law which incorporated extrajudicial

killing, pursuant to 28 U.S.C §§ 1331 and 1350 .

67) Decisions and other authorities. Extrajudicial killing is similarly reflected, expressed, defined

and codified in multilateral treaties and other instrumental instruments, international and

domestic judicial decisions, and other authorities, and is thus actionable.

68) Defendant's acts and omissions described caused Plaintiffs to suffer damages, including

severe mental and emotional pain and suffering in an amount to be proven in trial.

69) Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and

oppressive, and should be punished by an award of punitive damages in an amount to be

determined at trial.


### THIRD CLAIM FOR RELIEF

*(Extrajudicial Killing)*


70) Plaintiff's re-allege and incorporate by reference the allegations set forth in paragraphs 1

through 65 of this complaint as if fully set forth herein.

71) With regard to the events alleged herein, Defendant himself or through officers of the force under his control, acted under the actual or apparent authority and/or color of law of the state of India.

72) The killings of decedent's were deliberate and not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees that are recognized as indispensable by civilized peoples. The killings were not lawfully carried out under the authority of any country or court.

73) The killings of Decedents constitute extrajudicial killings as defined by the Torture Victim Protection Act, Pub .L. No. 102-256,106 Stat.73 (1992) (codified at 28 U.S.C § 1350, note). Additionally, the killings constitute torts committed in violation of the law of the nations, and thus of the United States, as reflected in federal common law which incorporates extrajudicial killings as a violation, pursuant to 28 U.S.C. §§ 1331 and 1350.The conduct constitutes violations of the law of nations and customary international law prohibiting extrajudicial killing, reflected, expressed, defined and codified in multilateral treaties and other international instruments and domestic judicial decisions and other authorities.

74) Defendant knew or should have known that police and security forces under his command and control torture and extra judicially kill individuals in Punjab.

75) Upon information and belief, no adequate remedies were available to the Plaintiff's as a practical matter in India.

76) Defendant's acts and omissions caused Plaintiffs and Decedent's next of kin to suffer damages, including severe physical and mental pain and suffering in amounts to be determined at trial.

77) Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### *(Negligence)*

78) Plaintiff's re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 73 of this Complaint as if fully set forth herein.

79) Defendant owned a duty to Plaintiffs because the police and other forces under the command and control of the defendant were known for human rights violations, custodial torture and extra judicial killings and defendant owed a duty to Plaintiff to not only control the police and other forces under his command but also to punish the police officers involved in such acts but the defendant has been doing just the opposite.

80) Beyond mere negligence, Defendant's acts were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in addition to compensatory damages, in respective amounts to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### *(Battery)*

81) Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 76 of this Complaint as if fully set forth herein.

82) Defendant through the forces in his command and control engaged in such contact with the plaintiffs that caused harm to the plaintiffs and the defendant intended to bring about this contact.

83) As a direct and proximate act of omission of the Defendant, Plaintiff's, other members of class and their decedents were harmed. It was reasonably foreseeable that the attack would cause this harm.

84) Defendant's acts and omissions caused Plaintiff's to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

85) Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

*(Intentional Infliction of Emotional Distress)*

86) Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 781of this Complaint as if fully set forth herein.

87) Defendant was in charge and in command of the police force and security forces and knew or should have known that the actions of the forces under his command would result in death and injuries the plaintiffs.

88) Defendant intended to bring about this contact.

89) Defendant intended to cause Plaintiffs to suffer humiliation, mental anguish and extreme emotional distress or, alternatively, Defendant recklessly disregarded a substantial

probability of causing humiliation, mental anguish, and severe emotional distress to Plaintiffs with his conduct.

90) As a direct and proximate cause of Defendant's outrageous conduct, Plaintiffs suffered severe emotional distress and mental suffering. It was reasonably foreseeable that the attack would cause this suffering.

91) Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF
### *(Negligent Infliction of Emotional Distress)*

92) Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 87 of this Complaint as if fully set forth herein.

93) Defendant owed a duty to Plaintiffs to refrain from intentional and wantonly harmful or outrageous conduct.

94) Defendant violated this duty and created an unreasonable and foreseeable risk of substantial bodily harm or death to the Plaintiffs.

## V.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment against Defendant as follows:

    a)  For compensatory damages in an amount to be proven at trial;

    b)  For  punitive and exemplary damages in an amount to be proven at trial;

    c)  For reasonable attorney's fees and cost of suits;

    d)  For a declaratory judgment holding that Defendant's conduct was in violation of the laws of nations.

    e)  For such other and further relief as the Court may deem just and proper.

A jury trial is demanded on all issues

Dated:   09-24-13

Avtar Singh

**PLAINTIFF**
**"Sikhs for Justice"**
through its Coordinator -- Avtar Singh
Empire State Building
350 Fifth Ave, 59th Floor,
New York, NY 10118
T: 212.301.2707 &  F: 212.601.2610

**PLAINTIFF**
Inderjit Singh
350 Fifth Ave, 59th Floor,
New York, NY 10118